# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

COLUMBIA STATE BANK,

        Respondent,

v.

INVICTA LAW GROUP PLLC,

        Defendant,

MARK V. JORDAN, individually and on behalf of the marital community comprised of MARK V. JORDAN and CYNTHIA JORDAN,

        Appellants.

No. 73915-8-I

DIVISION ONE

ORDER GRANTING MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION

Respondent Columbia State Bank has filed a motion for reconsideration of this court's opinion filed on May 22, 2017. The panel has determined that respondent's motion for reconsideration should be granted. The panel has further determined that the opinion filed on May 22, 2017, should be withdrawn and a substitute opinion be filed.

Now, therefore, it is

ORDERED that respondent's motion for reconsideration is granted.

It is further

ORDERED that the opinion filed on May 22, 2017, is withdrawn and a substitute opinion be filed.

DATED this 26th day of June, 2017.

WE CONCUR:

_Dwyer, J._

_Mann, J._

_Cox, J._

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| COLUMBIA STATE BANK, | ) | No. 73915-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| INVICTA LAW GROUP PLLC, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| MARK V. JORDAN, individually and on | ) | |
| behalf of the marital community | ) | |
| comprised of MARK V. JORDAN and | ) | PUBLISHED OPINION |
| CYNTHIA JORDAN, | ) | |
| | ) | |
| Appellants. | ) | FILED: June 26, 2017 |
| | ) | |

MANN, J. — Mark Jordan appeals the trial court's ruling that his sole proprietorship, Invicta Law Group, was a successor in liability to Invicta Law Group PLLC (PLLC) on a promissory note to Columbia State Bank (CSB). Jordan asserts that the trial court (1) erred in finding that the sole proprietorship is a successor to the PLLC under the "mere continuation" theory, (2) provided insufficient findings of fact, (3) abused its discretion in allowing refreshed recollection testimony supporting damages, and (4) erred in awarding CSB its attorney fees and costs. We affirm.

I

In 1999, Jordan formed the PLLC and was the sole member and manager. In February 2012, the PLLC borrowed $165,000 from CSB. In order to do so, the PLLC entered into several loan agreements including a commercial promissory note (note), a loan agreement, and a security agreement. Jordan signed all three loan documents as manager of the PLLC. Jordan also signed the loan agreement individually as guarantor.

Under the terms of the note, the PLLC was required to make 23 consecutive monthly payments of $2,377.04 beginning March 20, 2012, at an interest rate of 5.5 percent per year, with a final balloon payment of the balance on February 20, 2014. The security agreement granted CSB a first-priority security interest to

> [a]ll Equipment, Inventory, Chattel Paper, Accounts, and General Intangibles; whether it is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to the Collateral; all records and proceeds of any kind relating to the Collateral (including insurance, general intangibles and other account proceeds).

In the event of a default, the loan documents preserved the right for CSB to accelerate the loan and indebtedness; take immediate possession of the collateral; and pursue any remedy under any of the loan documents, at law or in equity.

Both the loan agreement and note included an "Attorneys' Fees and Other Costs" provision stating, if "legal proceedings are instituted to enforce the terms of this Note, borrower agrees to pay all costs of the lender in connection therewith, including reasonable attorneys' fees to the extent permitted by law." The note and security agreement include a "survival clause" confirming they are binding on all "heirs, executors, administrators, assigns and successors" of the borrower.

On September 30, 2013, Jordan filed for voluntary Chapter 7 bankruptcy. On January 2, 2014, the bankruptcy court discharged Jordan's personal guaranty on the loan agreement.

On the same day he filed for bankruptcy, Jordan also ceased operating as the PLLC. The PLLC did not file for bankruptcy.

When Jordan filed for personal bankruptcy, he also stopped (as sole owner and managing partner) making the PLLC's payments on the note. The PLLC made its last payment on the loan to CSB in October 2013. The PLLC maintained two bank accounts at CSB, a general account and an IOLTA[1] account. In September and October 2013, the PLLC deposited fewer and fewer funds into its CSB general account until all funds were withdrawn on October 25, 2013. The PLLC also withdrew funds held in the CSB IOLTA account, which historically carried a balance of approximately $20,000 to $23,000. All funds in the CSB IOLTA account were withdrawn by November 6, 2013.

The day after filing for personal bankruptcy, Jordan began operating a law practice known as the Mark V. Jordan sole proprietorship (sole proprietorship). The sole proprietorship was owned, operated, and controlled by Jordan. Jordan applied for and received a new tax identification number and a new unified business identifier number, and he opened new bank accounts at Umpqua Bank and American West Bank under the name Invicta Law Group.

Jordan continued his individual law practice, using the same name, website, signage, telephone number, offices, insurance, employees, and equipment, and representing the same clients. Jordan continued to use the full name Invicta Law

---

[1] IOLTA stands for Interest on Lawyer Trust Accounts.

Group, PLLC in new client engagement letters for nearly six months. Jordan also continued under the same contracts as the PLLC, including its lease agreement, subtenant agreements, existing client agreements, and malpractice insurance agreement. Jordan continued representing the same clients the PLLC had represented at the time the PLLC ceased operation. No clients left the PLLC due to its change in legal structure. Indeed, Jordan did not tell the clients about the change until months later. Jordan allocated nearly all of his income after September 30, 2013, from clients and from the sublease agreements, to the sole proprietorship's bank accounts.

After learning Jordan had filed for bankruptcy, counsel for CSB contacted counsel for Jordan and notified him that the loan was in default. CSB requested access to the collateral as well as detailed financial information. Jordan acknowledged the requests for information and offered to make the collateral available. Jordan never provided the requested financial information. Jordan moved some office equipment to a storage facility and sent a storage unit key to CSB. After inspection, CSB declined to accept the collateral as full or partial satisfaction of the debt. CSB explained that it did "not wish to take possession of the Collateral or dispose of the Collateral, as the estimated cost of disposition exceeds the value of the Collateral."

On February 6, 2014, CSB filed a lawsuit in King County Superior Court against the PLLC, Jordan, and Jordan's marital community. CSB's complaint alleged causes of action against the PLLC for breach of contract and for foreclosure of the security interest. CSB sought recovery against Jordan under a claim of successor liability. After initial discovery, CSB moved for summary judgment on its claims against the PLLC and Jordan. On December 17, 2014, the trial court granted summary judgment in favor of

-4-

CSB for its claims against the PLLC. The court denied CSB's motion as it pertained to the claim against Jordan for successor liability.

CSB's claim against Jordan for successor liability proceeded to a three-day bench trial in June 2015. The trial court issued its findings of fact and conclusions of law on July 9, 2015. The court found in favor of CSB and awarded CSB $151,360.40 against the PLLC and Jordan jointly and severally under the doctrine of successor liability, holding that Jordan's sole proprietorship was a "mere continuation" of the PLLC. Specifically, the trial court concluded (1) the PLLC defaulted on the note, (2) the PLLC transferred all of its assets to Jordan, (3) there was no consideration given by Jordan, and (4) Jordan was liable for the PLLC's obligations on the note.

CSB sought to recover $314,662.54 for its attorney fees and costs. After reviewing the fee petition and supporting declarations, the trial court reduced the requested fees and awarded CSB $258,045.78 for its attorney fees and costs. The attorney fees award was also jointly and severally against the PLLC and Jordan individually. The court entered a judgment and awarded $409,406.18 in damages against Jordan and the PLLC jointly and severally.

The trial court's judgment also held that CSB's interest in the collateral identified in the security agreement was superior to any claim of right or interest by the PLLC or Jordan. The court directed issuance of a writ of execution for law enforcement to take possession of the collateral and deliver it to CSB, and for any net proceeds or credits to be applied against the judgment. Jordan appealed.

II

Jordan argues first that CSB's equitable claim for successor liability is precluded because CSB had an adequate remedy at law. We disagree.

Successor liability is an equitable claim. A court may grant relief in both law and equity. GMB Enterprises, Inc. v. B-3 Enterprises, Inc., 39 Wn. App. 678, 687, 695 P.2d 145 (1985); Yount v. Indianola Beach Estates, Inc., 63 Wn.2d 519, 525, 387 P.2d 975 (1964). The general rule is that courts will not exercise equity jurisdiction when there is a clear, adequate, complete, and speedy remedy at law. Gall Landau Young Const. Co., Inc. v. Hedreen, 63 Wn. App. 91, 99, 816 P.2d 762 (1991); see also Roon v. King County, 24 Wn.2d 519, 166 P.2d 165 (1946) (holding equity will not act if there is a complete and adequate remedy at law). We review the decision of whether to grant equitable relief de novo. Niemann v. Vaughn Cmty. Church, 154 Wn.2d 365, 374, 113 P.3d 463 (2005).

Jordan argues that the trial court erred in granting equitable relief because CSB had an adequate remedy at law. Jordan contends that because CSB had the legal remedy of foreclosure against the PLLC and the collateral under the security agreement, equitable remedies are barred. Jordan does not dispute CSB's claim that after inspecting the stored collateral it determined that the "estimated cost of disposition exceeds the value of the Collateral." Jordan argues instead that it is irrelevant that the remaining assets of the PLLC and the collateral may not be sufficient to satisfy the judgment. Jordan ignores that the test for exercising equitable jurisdiction is whether the plaintiff lacks a "clear, adequate, complete, and speedy remedy at law." Gall, 63 Wn. App. at 99 (emphasis added). "Where the remedy by action for damages is

-6-

inadequate or insufficient to do complete justice between the parties, equity will take jurisdiction and grant proper relief." 30A C.J.S. Equity, § 25, 237 (2007). "[t]he fact that a plaintiff may have a remedy at law by an action for damages does not prevent equity from assuming jurisdiction if the equitable remedy is better adapted to render more perfect and complete justice than the remedy at law." 30A C.J.S. Equity, § 25 at 237. The trial court's conclusion that CSB was left without an adequate remedy at law was supported by substantial evidence.

Jordan relies on Seattle Mortgage Co. v. Unknown Heirs of Gray, 133 Wn. App. 479, 136 P.3d 776 (2006), to support his claim that CSB had an adequate legal remedy to foreclose on some of the PLLC's physical collateral. Seattle Mortgage did not involve a claim for successor liability. Instead, the Tacoma Public Utilities department (TPU) made a $3,186.96 loan secured by a deed of trust on the borrower's residence. After the borrower defaulted, TPU sought an equitable lien that would have allowed TPU to terminate utility service to the residence until the loan was paid. Seattle Mortgage, 133 Wn. App. at 499. The court refused to grant the equitable lien because TPU had the right to foreclose on the borrower's residence, which was worth substantially more than the loan balance. The court concluded that an equitable lien was not necessary to prevent injustice. Seattle Mortg., 133 Wn. App. at 500-01.

Here, the collateral made available by Jordan was not worth the cost of disposal. All of the other assets that belonged to the PLLC, including its clients and accounts, were transferred to Jordan's sole proprietorship. Foreclosure on the available collateral would be inadequate and would not provide a clear, adequate, or complete remedy.

Jordan's reliance on Sorenson v. Pyeatt, 158 Wn.2d 523, 544, 146 P.3d 1172 (2006), is similarly misplaced. In Sorenson, our Supreme Court rejected a claim for an equitable lien against real property because the plaintiff had already obtained an $868,000 judgment against the defendants based on a deed, and the owner of the real property was an innocent third party. Sorenson, 158 Wn.2d at 544. The court concluded that "the Lenders have failed to show how the equities would be served by requiring, in essence, Sorenson [innocent third party] to bear the burden of satisfying the Lenders' judgment against the Pyeatts [the defendants]." Sorenson, 158 Wn.2d at 544.

Here, unlike Sorenson, the trial court found CSB's legal remedy—foreclosure on the available collateral—inadequate in light of the debt owed. Moreover, Jordan is not an innocent third party; he is the successor to the PLLC.

This case is more similar to Gall. Gall concerned an attempt by the Gall Landau Young Construction Company (GLY) to hold the R.C. Hedreen Company (Hedreen), the successor to the assets of Parkside Building Company, liable for Parkside's debts to GLY. Hedreen asserted that the court could not exercise its equitable jurisdiction because GLY had prevailed against Parkside at the trial court level in bankruptcy court. Gall, 63 Wn. App. at 99. We disagree because GLY's claim in bankruptcy court was on appeal and therefore not certain, and also because there was "no guaranty" that GLY's bankruptcy claim would provide complete relief. Gall, 63 Wn. App. at 99-100.

Here, CSB prevailed on summary judgment in its claim to foreclose against the PLLC. However, there is no dispute that the collateral made available to CSB does not satisfy the amount owed on the debt. Based on this, the trial court concluded that "the

legal remedies that may be available to Plaintiff do not provide a guarantee that they would provide complete, or any, relief." Like Gall, CSB should be able to proceed in its equitable claim for successor liability against Jordan. The trial court did not err in exercising its equitable jurisdiction and granting both an equitable and a legal remedy.

III

Jordan argues next that the trial court's decision finding successor liability fails because there is no evidence supporting a transfer of assets from the PLLC to Jordan's sole proprietorship. We disagree.

Our review of an appeal from a bench trial is "limited to determining whether a trial court's findings are supported by substantial evidence, and if so, whether those findings support the conclusion of law." Am. Nursery Prods., Inc. v. Indian Wells Orchards, 115 Wn.2d 217, 222, 797 P.2d 477 (1990). "Substantial evidence is a quantum of evidence sufficient to persuade a rational fair-minded person." Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). "We view the evidence and all reasonable inferences in the light most favorable to the prevailing party. State v. Kaiser, 161 Wn. App. 705, 724, 254 P.3d 850 (2011). We do not review credibility determinations on appeal. Kaiser, 161 Wn. App. at 724. Unchallenged findings are verities on appeal. In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

Washington follows the general rule that "a corporation purchasing the assets of another corporation does not become liable for the debts and liabilities of the selling corporation." Cambridge Townhomes, LLC v. Pac. Star Roofing, Inc., 166 Wn.2d 475, 481-82, 209 P.3d 863 (2009). The rationale for this rule is a "bona fide purchaser who

gives adequate consideration and who lacks notice of prior claims against the property acquires no liability for those claims." Hall v. Armstrong Cork, Inc., 103 Wn.2d 258, 262, 692 P.2d 787 (1984)). There are, however, exceptions to this general rule. A successor may be held liable for the debts of a predecessor, where

> (1) there is an express or implied agreement for the purchaser to assume liability; "(2) the purchase is a de facto merger or consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability."

Cambridge, 166 Wn.2d at 482 (quoting Hall, 103 Wn.2d at 262).

The trial court found Jordan liable under the "mere continuation" exception to the general rule. Washington courts rely on several factors to determine whether a successor business is a mere continuation of a seller. These include (1) "a common identity between the officers, directors, and stockholders of the selling and purchasing companies" and (2) "the sufficiency of the consideration running to the seller corporation in light of the assets being sold." Cambridge, 166 Wn.2d at 482. The objective of the court when considering these factors is to determine whether the "'purchaser represents merely a new hat for the seller.'" Cambridge, 166 Wn.2d at 482. (internal quotation marks omitted) (quoting Cushar v. Redford, 28 Wn. App. 394, 397, 624 P.2d 194 (1981)). The particular form of the business entity is not determinative. Therefore, for the first factor, where a sole proprietorship is involved, while there can be no continuation of officers, directors, or shareholders, the court will consider "the continuity of individuals in control of the business as satisfying this factor." Cambridge, 166 Wn.2d at 482-83.

-10-

In Cambridge, a general contractor, Polygon, subcontracted with Gerald Utley during construction of the Cambridge Townhomes. Utley operated a sole proprietorship known as P.J. Interprize during his initial work for Polygon. Utley subsequently incorporated as P.J. Interprize Inc. (P.J. Inc.) and signed a new contract with Polygon. Polygon was later sued for construction defects and settled. Polygon then sued various subcontractors, including P.J. Inc. Polygon did not sue Utley or the sole proprietorship. Cambridge, 166 Wn.2d at 479-81. Our Supreme Court held P.J. Inc. liable for work done by Utley prior to the incorporation because (1) the business performed by the two entities was the same, (2) the same individual was "at the helm" of both entities, and (3) the clients, at least with respect to Polygon, remained the same. Cambridge, 166 Wn.2d at 483.

On the second factor, the adequacy of consideration, the court concluded:

There is no issue of sufficient consideration in this case because there was no sale of assets. Utley simply chose to incorporate his business. In sum, P.J. Inc. merely represented a new hat for the sole proprietorship.

Cambridge, 166 Wn.2d at 483. Thus, under Cambridge, when an entity merely changes its entity status but continues in the same business, with the same clients, that transition meets the requirements for asset transfer under the mere continuation theory.

In this case, the trial court's unchallenged findings of fact demonstrate that Jordan's transition from the PLLC to a sole proprietorship was nothing more than a change in entity status. Like in Cambridge, the business performed by the PLLC and Jordan's sole proprietorship was the same: a law practice. Similarly, the entity "at the helm" of both the PLLC and the sole proprietorship was the same: Jordan. And "[a]lmost without exception, the Sole Proprietorship continued representing the same

-11-

clients the PLLC had represented at the time the PLLC ceased operating." No clients left the PLLC due to its change in legal structure. Indeed, Jordan did not tell the clients until months later. In addition, like in Cambridge, there is no issue of sufficient consideration because there was no sale of assets. Jordan simply chose to quit operating the PLLC and begin operating the sole proprietorship. Cambridge, 166 Wn.2d at 483.

Indeed, the evidence of the "mere continuation" between the PLLC and Jordan's sole proprietorship goes beyond that identified as sufficient in Cambridge. Here, the sole proprietorship (1) operated at the same location as the PLLC, and had the same offices, space, signage, telephone number, and address, (2) operated under the same lease as the PLLC, and between September 30, 2013, and February 2015 continued to hold itself out to the landlord as the PLLC, (3) used the same office equipment, furniture, and inventory as the PLLC, (4) used the same contact information as the PLLC including the same phone number, e-mail address, fax number, letterhead, and website, (5) used the same employees as the PLLC, and (6) held itself out to its current and new subtenants as the PLLC including entering a new sublease agreement on October 31, 2013, under the name of the PLLC, and as the trial court explained, held itself out to its malpractice insurance carrier as the PLLC for over a year:

> In November 2014, Mr. Jordan informed the PLLC's insurance carrier that the PLLC was changing its name to "Bracepoint Law." The name of the insured on the PLLC's Professional Liability insurance policy was changed from the PLLC to Bracepoint Law by way of a name change endorsement. The policy was not terminated. No new policy was issued. During this process, Mr. Jordan informed the PLLC's Professional Liability Insurance carrier that the Sole Proprietorship (d/b/a Bracepoint Law) was the "true successor" of the PLLC.

As in Cambridge, the undisputed facts make clear that Jordan's business as a sole proprietor "merely represented a new hat" for the PLLC.

IV

Jordan challenges the trial court's findings of fact as being inadequate because they "lack any specificity" and contained only "conclusory statements." We disagree.

Under CR 52, a trial court's findings of fact and conclusions of law "must be sufficiently specific to permit meaningful review." In re Det. of LaBelle, 107 Wn.2d 196, 218, 728 P.2d 138 (1986). A trial court is not required to make findings of fact on all matters raised, but "only those which establish the existence or nonexistence of determinative factual matters." LaBelle, 107 Wn.2d at 219. The findings "should at least be sufficient to indicate the factual bases for the ultimate conclusions," although the "degree of particularity required . . . depends on the circumstances of the particular case." LaBelle, 107 Wn.2d at 218. When the findings and conclusions are missing or are defective, the proper remedy is to remand for entry of adequate ones unless the appellate court is persuaded that sufficient basis for review is present in the record. Little v. King, 160 Wn.2d 696, 699, 161 P.3d 345 (2007).

In this case, the trial court provided substantial findings covering all relevant issues raised. The trial court is not required to describe each finding in detail, only enough to permit meaningful review. The trial court's findings are sufficient.

The trial court's unchallenged findings of fact amply support the conclusion that the sole proprietorship was a "mere continuation" of the PLLC. Jordan, however,

challenges the trial court's findings of fact 23-34 and 36-38, claiming that they are not supported by substantial evidence.[2]

The majority of the challenged findings, findings 23-34, concern the "transfer" of the PLLC's assets to the sole proprietorship.[3]  For findings of fact 23-34, Jordan maintains they are not supported by substantial evidence because there was no formal assignment or sale where the PLLC formally agreed to transfer the assets to the sole proprietorship.  Jordan argues that CSB cannot demonstrate that the PLLC transferred any of the PLLC's assets (the lease, the rights to the security deposit on the lease, the value of the tenant improvements, the rights to the sublease payments, the clients' payments and agreements, the use of the office equipment, the contact information, and the company name and goodwill) to the sole proprietorship because there was no

---

[2] Jordan fails to provide argument supporting his challenge to findings of fact 37 and 38.  Failure to provide argument and citation to authority in support of an assignment of error precludes appellate consideration of the alleged error.  Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); RAP 10.3.

[3] Findings of fact 23-34 provide:

23. The PLLC transferred all of its physical assets to the Sole Proprietorship.
24. The PLLC transferred the right to use the PLLC's space to the Sole Proprietorship.
25. The PLLC transferred its rights in its existing subleases, including the subtenant rents owed and paid to the PLLC, to the Sole Proprietorship.
26. The PLLC transferred its rights in existing client contracts to the Sole Proprietorship.
27. The PLLC transferred client fees paid for work done by the PLLC to the Sole Proprietorship.
28. The PLLC transferred the PLLC's client list to the Sole Proprietorship.
29. The PLLC transferred the PLLC's existing client relationships and any goodwill generated therefrom to the Sole Proprietorship.
30. The PLLC transferred the PLLC's trade name to the Sole Proprietorship.
31. The PLLC transferred security deposit funds owned by PLLC to the Sole Proprietorship.
32. The PLLC transferred all benefits associated with the PLLC's insurance contracts to the Sole Proprietorship.
33. The PLLC transferred the value and benefits of all tenant improvements paid for by the PLLC and used by Sole Proprietorship in the office space at 2775 Harbor Avenue, Seattle, Washington to the Sole Proprietorship.
34. The PLLC transferred every aspect of the PLLC which would be needed to start a law practice to the Sole Proprietorship.

-14-

writing indicating that he did so. However, as in Cambridge, no legal transfer was required, as Jordan owned the past business and simply continued using the assets for his new business. See Cambridge, 166 Wn.2d at 483.

It is undisputed that Jordan testified at trial that the PLLC ceased operating on September 30, 2013. Jordan also testified that after filing for bankruptcy and becoming a sole proprietorship, he continued his law practice, using the same name, offices, insurance, employees, equipment, clients, and contact information as the PLLC. Regardless of whether there was a formal document transferring assets, the assets were transferred. Under Washington law, "[l]iability may be imposed regardless of the exact form of transfer of assets between the corporations." Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp., 135 Wn.2d 894, 901, 959 P.2d 1052 (1997); see also Stoumbos v. Kilimnik, 988 F.2d 949, 961 (9th Cir. 1993) ("We conclude that the Washington court would extend liability to transfers other than straightforward purchases. Otherwise, unscrupulous businesspersons would be able to avoid successor liability and cheat creditors merely by changing the form of the transfer.").

Jordan next claims that there is no evidence to support finding of fact 36. Finding of fact 36 provides:

> The PLLC secretly transferred accounts received (AR) to the Sole Proprietorship. The value of the accounts receivable was significant—according to the PLLC's journal ledger for May 31, 2013 through September 30, 2013. The firm brought in $396,462.06 (Exhibits 76). Notably, the Sole Proprietorship generated $557,202.00 from these same clients from January—November 2014 (Exhibit 76).

Jordan does not dispute the income levels referenced by the trial court. He instead asserts that because the ledgers show he earned less per month in 2014 than he did in

-15-

2013, the evidence does not prove that the accounts were transferred from the PLLC to the sole proprietorship. We disagree.

On September 30, 2013, Jordan opened a new bank account using the name "Invicta Law Group" for the sole proprietorship. Jordan then began depositing client checks and sublease checks made out to the PLLC into the sole proprietorship bank accounts. Jordan also uninterruptedly used the full name Invicta Law Group PLLC in new client engagement letters for nearly six months after switching to the sole proprietorship. While CSB provided only one document showing the client check included work done before becoming a sole proprietor, the trial court reasonably concluded that the billings that came in over the next couple of months likely included work done while working for the PLLC.

The trial court's findings of fact are supported by substantial evidence and support its conclusion that the sole proprietorship was a mere continuation of the PLLC.

V

The trial court found that as of May 4, 2015, the PLLC and its successor owed CSB $151,360.40 based on the principal sum of $130,034.21, plus $20,850.69 in interest and $475.40 in late fees. Evidence of the amount owed was introduced through the testimony of CSB employee Alana Rouff. Jordan argues that Rouff's testimony was inadmissible, and therefore, there was no admissible evidence supporting the award. We disagree.

At trial, Rouff testified that she was CSB's vice president and special credit workout officer. After identifying the original promissory note between CSB and the PLLC, she was asked how much was currently owed to CSB. After she could not

-16-

remember, counsel for CSB showed Rouff a copy of the most recent payoff statement and asked if the document refreshed her memory. Rouff answered yes. Counsel for Jordan objected to the testimony, claiming that the printout was hearsay. The trial court overruled the objection:

> I'm going to overrule your objection, and the reason I'm overruling the objection is because she's testified with respect to her position at the bank, her familiarity with the records associated with the note, Exhibit 7, and that she would have knowledge of this in the normal course of her profession. I'm also satisfied that the document that's been shown to her, Exhibit 85, had independently refreshed her memory. And what she's testifying to is not simply the document, but her memory now that it has been refreshed.

After counsel for Jordan restated the objection, the trial court allowed counsel to question the witness. At the conclusion of the voir dire, the court again overruled the objection. After reviewing the payoff statement, Rouff testified that as of June 1, 2015, the amount due was $152,422.24.

Jordan maintains that the testimony was inadmissible because the printout CSB provided to Rouff to refresh her recollection about the amount owed on the loan was inadmissible hearsay that did not refresh her recollection but instead informed her of the information so that she could read it on the stand.

Under ER 612, a witness may use a writing to refresh his or her memory while testifying. Allowing the use of notes to refresh the memory of a witness lies within the discretion of the trial court. State v. Huelett, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979). The extent to which the witness may use such a memorandum is for the trial court in its discretion to determine, and its ruling will not be disturbed unless there has been an abuse of such discretion. Huelett, 92 Wn.2d at 969. Such abuse occurs only if no

reasonable person would take the view adopted by the trial court. Huelett, 92 Wn.2d at 969 (citing State v. Blight, 89 Wn.2d 38, 41, 569 P.2d 1129 (1977)).[4]

A writing used solely to refresh the witness's memory has few limitations. The writing "need not be admissible as evidence" and "need not satisfy the hearsay and best evidence rules." 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 612.4, 612.2 (6th ed. 2016). The writing also "need not have been prepared by the witness." Id. § 612.4. "'The primary evidence is the oral statement of the . . . witness. It is not so important when the statement was made or by whom if it serves the purpose to refresh the mind and unfold the truth.'" United States v. Riccardi, 174 F.2d 883, 888 (3d Cir. 1949) (quoting Hoffman v. United States, 87 F.2d 410, 411 (9th Cir. 1937)). The witness's "testimony is the evidence, the writing is not." State v. Little, 57 Wn.2d 516, 520, 358 P.2d 120 (1961).

The criteria for refreshing a witness's recollection are "(1) that the witness' memory need refreshing, (2) that opposing counsel have the right to examine the writing, and (3) that the trial court be satisfied that the witness is not being coached— that the witness is using the notes to aid, and not to supplant, his own memory." Little, 57 Wn.2d at 521. Here, the criteria were met. Rouff testified that she could not recall the exact loan balance. Counsel for Jordan then had the opportunity to review the document, question Rouff, and then cross-examine Rouff. The trial court held "that the

---

[4] Jordan argues that this court should review de novo whether the document used to refresh Rouff's recollection was hearsay. However, de novo review is limited to determinations of whether hearsay statements are admissible as evidence. Here, the document was never admitted into evidence, and a writing need not be admissible as evidence when it is used solely to refresh the witness's memory. 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 612.4 (6th ed. 2016). Therefore, although this court reviews whether a statement was hearsay de novo, this court reviews whether a witness may use a document to refresh her recollection for abuse of discretion.

document that's been shown to her . . . had independently refreshed her memory. And what she's testifying to is not simply the document, but her memory now that it has been refreshed."

Jordan cites Podbielancik v. LPP Mortg., Ltd, 191 Wn. App. 662, 667, 362 P.3d 1287 (2015), to support his claims that Rouff could not use the printout to refresh her recollection because it was inadmissible and not in evidence. Podbielancik is not applicable. In Podbielancik, the witness recited the contents of a document in a declaration without attaching the document to the declaration. This court held "the business records exception does not permit affidavits testifying to the contents of documents that are not in the record." Podbielancik, 191 Wn. App. at 667. This holding is irrelevant in a case regarding documents used to refresh the witness's recollection, in that those documents are not required to be admissible or admitted as evidence.

The trial court did not abuse its discretion in allowing Rouff's testimony.

Further, even if the trial court had abused its discretion in allowing the document to refresh Rouff's recollection, the error was harmless. An erroneous evidentiary ruling does not result in reversal unless the defendant was prejudiced. State v. Thomas, 150 Wn.2d 821, 871, 83 P.3d 970 (2004). Where the error results from a violation of an evidentiary rule, the "'error is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" Thomas, 150 Wn.2d at 871 (quoting State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)). "'The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as

a whole.'" Thomas, 150 Wn.2d at 871 (quoting State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)).

Damages must be proven with reasonable certainty. Lewis River Golf, Inc. v. O.M. Scott & Sons, 120 Wn.2d 712, 717, 845 P.2d 987 (1993). The doctrine of reasonable certainty is "concerned more with the fact of damage than with the extent or amount of damage." Gaasland Co. v. Hyak Lumber & Millwork, Inc., 42 Wn.2d 705, 712, 257 P.2d 784 (1953) (emphasis omitted). Once the fact of loss is proved with reasonable certainty, uncertainty or difficulty in determining the amount of the loss will not prevent recovery. Lewis River, 120 Wn.2d at 717-18. Evidence of damage is sufficient if it gives the trier of fact a reasonable basis for estimating the loss and does not require mere speculation or conjecture. Clayton v. Wilson, 168 Wn.2d 57, 72, 227 P.3d 278 (2010).

In this case, the evidence presented, even disregarding Rouff's testimony, was sufficient to provide the trial court with "a reasonable basis for estimating the loss." Clayton, 168 Wn.2d at 72. The record included the note and other loan documents, which contained (1) the loan amount, (2) the date of first payment, (3) the date of maturity, (4) the payment amounts, (5) the interest rate, and (6) all penalty provisions. From the evidence provided, the trial court could determine the amount owed on the loan. In fact, the record indicates that the trial court considered other evidence besides Rouff's testimony, as the final damage award differed slightly ($151,360.40) from the amount provided by Rouff ($152,422.24).

VI

Jordan argues finally that the trial court erred in awarding attorney fees and costs to CSB under the attorney fee provision in the note, which provided for an award of fees in any legal proceeding to enforce the terms of the note. We disagree.

Whether a party is entitled to attorney fees is an issue of law that we review de novo. Boguch v. Landover Corp., 153 Wn. App. 595, 615, 224 P.3d 795 (2009). The general rule in Washington, commonly referred to as the "American rule," is that each party in a civil action will pay its own attorney fees and costs. Cosmo. Eng'g Grp., Inc. v. Ondeo Degremont, Inc., 159 Wn.2d 292, 296, 149 P.3d 666 (2006). Attorney fees and costs "may be recovered only when authorized by a private agreement of the parties, a statute, or a recognized ground of equity." Penn. Life Ins. Co. v. Dep't of Emp't. Sec., 97 Wn.2d 412, 413, 645 P.2d 693 (1982).

A prevailing party in a contract action may recover attorney fees under a contractual fee shifting provision such as the one at issue here "only if the party brings a 'claim on the contract,' that is, only if the party seeks to recover under a specific contractual provision." Boguch, 153 Wn. App. at 615. If the claimed breach of duty is based on another source, such as a statute or the common law, "the party does not bring an action on the contract, even if the duty would not exist in the absence of a contractual relationship." Boguch, 153 Wn. App. at 615. "[A]n action is on a contract for purposes of a contractual attorney fees provision if the action arose out of the contract and if the contract is central to the dispute." Tradewell Grp., Inc. v. Mavis, 71 Wn. App. 120, 130, 857 P.2d 1053 (1993). "Stated differently, an action 'sounds in contract when the act complained of is a breach of a specific term of the contract, without reference to

-21-

the legal duties imposed by law on that relationship.'" Boguch, 153 Wn. App. at 616 (quoting G.W. Constr. Corp. v. Prof'l Serv. Indus., Inc., 70 Wn. App. 360, 364, 853 P.2d 484 (1993)).

Here, it is undisputed that the underlying action was against the PLLC for breach of the note. The note is central to the dispute with Jordan. Jordan's liability as the successor of the PLLC arises from and directly depends upon the action to enforce the note against the PLLC.

CSB relies principally on two California cases, Brown Bark III, L.P. v. Haver and Reynolds Metals Co. v. Alperson, to support the argument that Jordan is liable for attorney fees as the successor.[5] In Reynolds, the California Supreme Court held that an "alter ego" of a company would be liable under the contracts fee provision. Reynolds Metals Co. v. Alperson, 25 Cal. 3d 124, 129, 599 P.2d 83, 158 Cal. Rptr. 1 (1979). Relying on Reynolds, the California Court of Appeals more recently held that a nonsignatory to a contract could recover attorney fees under the contract for successfully defending against a claim for successor liability. Brown Bark III, L.P. v. Haver, 219 Cal. App. 4th 809, 824, 162 Cal. Rptr. 3d 9 (2013).

In Brown Bark, the plaintiff, Brown Bark III, L.P., originally sued Westover Financial to recover the balance on a line of credit plus interest, penalties, and attorney fees. Around the time the action was filed, Westover Financial dissolved. The plaintiff then amended its complaint to add Westover Capital based on a theory of successor liability. The plaintiff claimed Westover Capital was merely a continuance of Westover

---

[5] CSB also relies on an unpublished Minnesota Court of Appeals case, where the court held that the trial court did not err in awarding costs against the successor company because the underlying judgment resulted from the contractual dispute. Schwartz v. Virtucom, Inc., No. A08-1059, 2009 WL 1311816 (Minn. Ct. App. May 12, 2009) (unpublished).

Financial. After trial, Westover Capital prevailed in defeating Brown Bark's claim of successor liability. Brown Bark, 219 Cal. App. 4th at 821-22. In response to Westover Capital's request for attorney fees under the line of credit contract, Brown Bark argued that it did not sue Westover Capital on the contract, but instead sued Westover Capital on the successor liability claim only. Brown Bark, 219 Cal. App. 4th at 822.

The California Court of Appeals disagreed, explaining:

[s]uccessor liability is not a separate claim independent of Brown Bark's breach of contract claims. To the contrary, successor liability is an equitable doctrine that applies when a purchasing corporation is merely a continuation of the selling corporation or the asset sale was fraudulently entered to escape debts and liabilities. Successor liability requires an underlying cause of action and merely extends the liability on that cause of action to a corporation that would not otherwise be liable.

Brown Bark, 219 Cal. App. 4th at 822-23 (citations omitted).

California and Washington case law apply similar standards for finding fees under a contract, so these California cases are persuasive. We agree with the California courts that a claim for successor liability follows an underlying cause of action for breach of contract and merely exists to extend "the liability on that cause of action to a corporation that would not otherwise be liable." Brown Bark, 219 Cal. App. 4th at 822-23. We also agree that the successor becomes liable under the contract, including the provision for attorney fees.

Jordan relies heavily on our decision in Boguch to support his argument that CSB's action was not an action to enforce the note. But Boguch is readily distinguishable. In Boguch, the plaintiff entered an exclusive sale and listing agreement for the sale of his property. After the property failed to sell, the plaintiff discovered that the aerial photograph of the property posted on the MLS website contained incorrect

boundary lines that made the property look unevenly narrow in places. Boguch sued the listing agents for negligence, for breaching their professional duties under chapter 18.86 RCW and for a breach of contract under the listing agreement. Boguch, 153 Wn. App. at 601-03. The trial court granted summary judgment dismissing all of Boguch's claims and awarded the defendants their attorney fees under the listing agreement. We reversed the award of attorney fees on appeal. In doing so, we explained, that the common law and statutory duties of care were independent of the contract:

> Although [the defendant's] duty to Boguch arose because the parties entered into a contractual relationship, the listing agreement itself does not specify the duty of care that the Realtor must provide. To the contrary, the common law and chapter 18.86 RCW imposed a duty to exercise reasonable care on the Realtors. Although the statute may be read as being incorporated into the listing agreement by reference, it does not follow that any act taken in fulfillment or derogation of that duty constitutes specific contractual performance or breach thereof.

Boguch, 153 Wn. App. at 617.

But here, as discussed by the California court in Brown Bark, CSB's successor liability claim against Jordan is not a separate claim independent of the PLLC's breach of contract claims. "Successor liability requires an underlying cause of action and merely extends the liability on that cause of action to a corporation that would not otherwise be liable." Brown Bark, 219 Cal. App. 4th at 823. In other words, but for the contract claim against the PLLC, CSB would not have an independent claim for successor liability against Jordan.

Jordan relies also on our recent decision in 4518 S. 256th LLC v. Karen L. Gibbon, PS, 195 Wn. App. 423, 382 P.3d 1 (2016), in support of his argument that

-24-

because he was not a party to the original note, he cannot be held liable for attorney fees under the note. In Gibbon we explained:

> Although the deed of trust is central to this controversy, the parties fail to recognize that the LLC was not a party to the deed of trust. Additionally, as we just discussed, the LLC did not assume or agree to pay the loan on acquisition of title.
>
> In Watkins v. Restorative Care Center, Inc., this court held that a contractual attorney fee provision cannot authorize the recovery of fees from a nonparty. 66 Wn. App. 178, 194, 831 P.2d 1085 (1992). It reasoned that it "would be both unfair and contrary to law" to enforce the provision against the nonparty who was a "stranger[ ]" to that agreement. 66 Wn. App. at 195.
>
> The same reasoning applies in this case. Because the LLC was not a party to the deed of trust, it would be contrary to law to enforce the attorney fee provision in that document against it. Similarly, because a contract does not confer benefits on nonparties, it would be also contrary to law to award attorney fees to the LLC based on the deed of trust.

Gibbon, 195 Wn. App. at 447-48 (alteration in original).

But here, while Jordan was not a party to the loan agreements with CSB, Jordan was certainly not a "stranger" to the agreements. He signed all of the documents on behalf of the PLLC. Moreover, successor liability exists in equity to protect creditors from debtors that attempt to change corporate form, sell off their assets, or merge with another company in an attempt to avoid their debts. The "mere continuation" theory was specifically designed to prevent a company from escaping liability "by merely changing hats," i.e., transferring all of the company's assets and continuing business in another form. Gall, 63 Wn. App. at 96-97. Once the trial court found Jordan was a "mere continuation" of the PLLC, he assumed the liabilities incurred by the PLLC. See Cambridge, 166 Wn.2d at 483.

Indeed, the very doctrine of successor liability contemplates liability against nonsigning third parties. The concept is that liability rests against the original entity to the contract but that the plaintiff cannot recover under the contract because the liable entity has transferred assets to a separate entity as a way of avoiding the obligation. There is fundamentally no difference between successor liability for judgment on the unpaid note and successor liability for attorney fees. Both are assessed initially against the liable party and then flow to the successor.

We affirm the trial court's award of attorney fees and costs to CSB.

VII

CSB's request for attorney fees on appeal is granted subject to compliance with RAP 18.1.

We affirm the trial court's decision.

_Mann, J._

WE CONCUR:

_Dwyer, J._

_Cox, J._