IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CALLUM HERDSON, an individual, | No. 86536-6-I |
| Respondent, | DIVISION ONE |
| v. | |
| RICHARD FORTIN, ROBERT ENSLEN, XCAR INC, FTW SERVICES, INC, XCAR REMARKETING INC, CROSS BORDER VEHICLE SERVICES, INC, and CROSSBORDER VEHICLE SALES, LTD, | UNPUBLISHED OPINION |
| Appellants. | |

SMITH, J. — In 2012, Richard Fortin and Robert Enslen formed XCar, a used car dealership. In 2014, Fortin and Enslen hired Callum Herdson to act as president of XCar, granting him a one-third interest in the company as a nonvoting minority shareholder. Fortin and Enslen later fired Herdson. Herdson brought an action against Fortin and Enslen, claiming minority shareholder oppression. The trial court entered judgment for Herdson and, in lieu of dissolving the corporation, appointed a receiver. Fortin and Enslen appealed. After this court accepted review, the trial court entered an order appointing special fiscal agents and a forensic auditor instead of the receiver.

On appeal, this court affirmed the trial court's ruling but held that the trial court lacked the authority to appoint the special fiscal agents. On remand, the

trial court entered judgment in favor of Herdson and ordered Fortin and Enslen to buy out Herdson's shares in XCar. Fortin and Enslen again appeal, asserting that the trial court erred in entering judgment in favor of Herdson, in valuing his shares as of June 2021, and in imposing that judgment against other companies also owned by Fortin and Enslen. They also contend that the court erred by not offsetting Herdson's judgment by discovery costs. Finding no error, we affirm.

FACTS

Background

Richard Fortin and Robert Enslen formed XCar, Inc., a used car dealership, in 2012. At the time, Fortin and Enslen owned and operated several other wholesale and retail car companies: Crossborder Vehicle Services, Inc., Crossborder Vehicle Sales Ltd., XCar Remarketing, Inc., and FTW Services, Inc. (collectively "Crossborder-owned companies"). XCar is not a subsidiary of any of the Crossborder-owned companies.

In 2014, Fortin and Enslen hired Callum Herdson to act as president of XCar, granting him one-third of its stock as common, nonvoting shares. Fortin and Enslen retained the remaining preferred voting shares, splitting them equally. Although the parties did not execute a written shareholder agreement, they signed a "Consent Resolution of the Board of Directors for XCar, Inc.," documenting the share split. Consistent with the distribution of shares, the parties agreed that each owner would receive one-third of XCar's after-tax net

profits. Fortin and Enslen retained ultimate control over XCar's operations and management.

Fortin and Enslen then terminated Herdson's employment in February 2017. He retained his shares in the company. In December 2019, Herdson sued Fortin, Enslen, XCar, and the Crossborder-owned companies, alleging that Fortin and Enslen failed to distribute his share of XCar's profits. He asserted a breach of fiduciary duty, breach of a shareholder agreement, fraudulent inducement, promissory estoppel, unjust enrichment, and accounting. He also argued that Fortin, Enslen, and the Crossborder-owned companies were alter egos of each other and requested that the court pierce the corporate veil to hold all jointly and severally liable. As a remedy, Herdson requested that a court-appointed receiver dissolve XCar under RCW 23B.14.300. Alternatively, he requested the court order Fortin and Enslen to buy back his shares of XCar at their current value.

## Trial

The case proceeded to trial in November 2021. Following seven days of the parties' presentation of evidence, the trial court dismissed all of Herdson's claims save his minority oppression claim against Fortin and Enslen. The court determined that Fortin and Enslen engaged in oppressive conduct by hiding financial information, subordinating XCar's independent interests to the interests of the Crossborder-owned companies, manipulating XCar's finances, not accounting, and failing to distribute Herdson's share of XCar's net profits.

3

The court nevertheless rejected both of Herdson's requested remedies because they were too extreme. Instead, it appointed a receiver to oversee XCar's financial operations and accounting records until XCar's profits were accurately ascertained, its interests sufficiently protected, and safeguards imposed to ensure that Herdson received his share of the profits. The court acknowledged that it would consider reasonable alternatives to the receiver as long as the proposed options would account for yearly profits and distribute past profits evenly to shareholders. The court declined to award any fees.

Fortin and Enslen appealed the trial court's findings of fact in February 2022.[1] After this court accepted review, the trial court entered an order appointing special fiscal agents and a forensic auditor in lieu of a receiver.

## Receiver and Special Fiscal Agent

Herdson proposed that the trial court appoint the Stapleton Group ("Stapleton") as receiver. Fortin and Enslen disagreed, proposing that the court appoint Ernst & Young to perform a forensic accounting and ongoing oversight of XCar's finances. Adopting Fortin and Enslen's suggestion, the trial court appointed Ernst & Young as a forensic auditor and "special fiscal agent" in lieu of a traditional receiver in February 2025. As a forensic auditor, the court required that Ernst & Young perform a historical forensic accounting of XCar's finances from March 2014 on, and present its findings. As a special fiscal agent, the trial

---

[1] The facts concerning Fortin and Enslen's initial appeal come from this court's published opinion in *Herdson v. Fortin,* 26 Wn. App. 2d 628, 530 P.3d 220, *review denied*, 2 Wn.3d 1009 (2023).

court granted Ernst & Young the authority to oversee XCar's financial operations and accounting records on a continuing basis.

Herdson repeatedly objected to the court's appointment of Ernst & Young, moving several times that the court appoint Stapleton instead. In response, the trial court appointed a former superior court judge to serve as a special master under CR 53.3. Although Fortin and Enslen objected to this appointment, the trial court stated that it was busy with many other tasks at the court and that this would allow the parties to get more immediate attention and hopefully get the issues resolved.

In October 2022, the special master issued a recommendation that Stapleton replace Ernst & Young. The trial court agreed and appointed Stapleton in Ernst & Young's place.

<u>Sale of XCar</u>

Over the course of its existence, XCar required a line of credit to provide the cashflow needed to purchase the vehicles it sold. NextGear Capital ("NextGear") provided that line of credit. But, while XCar was under Ernst & Young's review, NextGear changed its method of calculating loans. Determining that it had overfunded XCar by roughly $1.5 million, NextGear withdrew its line of credit in late 2022.

Unable to find a replacement line of credit, Fortin and Enslen eventually sold XCar's assets to Windy Chevrolet. Windy Chevrolet bought XCar's office equipment, shop equipment, goodwill, and the rights to reviews and marketing for

$200,000. The agreement did not include the vehicles in XCar's inventory, which Windy Chevrolet purchased separately. XCar ultimately dissolved in October 2023.

Herdson objected to the sale of XCar's assets, repeatedly alleging that the sale was intended to defraud both Herdson and the court. Greg Doublin and Mario Lyons, former employees of XCar, supported this theory, testifying that after executing the sale, Fortin and Enslen stated, "Fuck Cal. We got him" and danced around laughing. Although Fortin and Enslen did not contradict this particular testimony, they disputed the idea that the sale was intended to defraud.

### Initial Appeal

Following the trial court's initial determination but before it appointed Ernst & Young, Fortin and Enslen appealed the trial court's findings of fact and conclusions of law.[2] When the trial court appointed Ernst & Young, Fortin and Enslen amended their appeal to challenge the appointment they themselves had requested.

This court issued its opinion in May 2023. Determining that the trial court's findings as to minority shareholder oppression were supported by substantial evidence and that the court did not abuse its discretion in fashioning an equitable remedy, this court affirmed each count of the trial court's rulings except the appointment of special fiscal agents and a forensic auditor. Because the trial court had not properly complied with RAP 7.2 in appointing the agents,

---

[2] Again, the facts concerning Fortin and Enslen's initial appeal come from this court's published opinion in *Herdson*.

6

this court reversed the order. Remanding on that singular issue, this court expressly provided that the trial court maintained the authority to order a remedy it deemed equitable.

### Remand

On remand in January 2024, the trial court requested that both parties submit additional briefing on the appropriate remedy in light of the fact that XCar no longer existed. Herdson again alleged that Fortin and Enslen intended to defraud both him and the court and requested the value of his interest in XCar as of June 2021. Fortin and Enslen argued that the record did not support a finding of fraud and that Herdson's share should be valued as of February 2017, when his employment was terminated.

Referencing the appellate decision, the trial court noted the record supported Herdson's original request that Fortin and Enslen buy out his shares in the company. The trial court similarly determined that the record, including credible expert testimony at trial, supported the valuation of Herdson's interest in XCar at $4.23 million. And recognizing that XCar no longer existed, the court acknowledged no need exists to establish procedures or standards to protect minority shareholders' interests going forward and therefore no need for a receiver.

The court entered judgment in favor of Herdson, awarding him the $4.23 million value of his shares, plus costs of the appeal and accruing interest.

Fortin and Enslen timely appealed.

ANALYSIS

Standard of Review

We review the fashioning of equitable remedies for an abuse of discretion. *Herdson v. Fortin*, 26 Wn. App. 2d 628, 651, 530 P.3d 220, *review denied*, 2 Wn.3d 1009 (2023). A trial court abuses its discretion if its decision or order is manifestly unreasonable or based on untenable grounds or reasons. *Stocker v. Univ. of Wash.*, 33 Wn. App. 2d 352, 359, 561 P.3d 751 (2024). Whether equitable relief is appropriate at all is a question of law we review de novo. *Herdson*, 26 Wn. App. 2d at 651.

Judgment Supported by Record

Fortin and Enslen assert that the record does not support the trial court's order requiring Fortin and Enslen to buyout Herdson's shares in XCar because the court had already rejected that option as an extreme remedy. Herdson states that both the record and this court's earlier review provide substantial evidence to support the trial court's order. Because the trial court determined that Herdson was a minority shareholder, that he had experienced minority shareholder oppression, and that no need exists to protect future interests or sustain the business, we agree with Herdson.

We review a trial court's findings of fact for substantial evidence. *Columbia State Bank v. Invicta Law Grp., PLLC*, 199 Wn. App. 306, 319, 402 P.3d 330 (2017). Evidence is substantial if it is sufficient to persuade a rational, fair-minded person of the truth of the asserted premise. *Columbia State Bank*,

199 Wn. App. at 319.  " 'We view the evidence and all reasonable inferences in the light most favorable to the prevailing party.' " *Columbia State Bank*, 199 Wn. App. at 319 (quoting *State v. Kaiser*, 161 Wn. App. 705, 724, 254 P.3d 850 (2011)).

" 'It is a recognized principle that majority shareholders must, at all times, exercise good faith toward the minority stockholders.' " *Herdson*, 26 Wn. App. 2d at 639 (internal quotation marks omitted) (quoting *Real Carriage Door Co., Inc. v. Rees*, 17 Wn. App. 2d 449, 458, 486 P.3d 955 (2021).  In Washington, minority shareholders who experience oppressive conduct have several potential remedies under the law, including judicial dissolution of the corporation. *Herdson*, 26 Wn. App. 2d at 649.  But courts are generally reluctant to dissolve corporations and require plaintiffs to meet a rigorous burden of proof.  *Herdson*, 26 Wn. App. 2d at 639.  So, in addition to dissolution, courts may consider less severe alternatives.  *Herdson*, 26 Wn. App. 2d at 639.  This includes the buyback of the minority shareholders' shares at fair value or awarding damages. *Herdson*, 26 Wn. App. 2d at 650.  But a court abuses its discretion in imposing an extreme remedy when a lesser remedy would suffice.  *Scott v. Trans-System, Inc.,* 148 Wn.2d 701, 718-19, 713, 64 P.3d 1 (2003).

The definition of oppressive conduct includes burdensome, harsh, and wrongful actions, a lack of fair dealing, and a visible departure from the standards of fair play.  *Real Carriage Door Co.*, 17 Wn.  App. 2d at 455-56.

Here, Herdson provided substantial evidence that Fortin and Enslen engaged in minority shareholder oppression. The record displays significant evidence of Fortin and Enslen's pattern of oppressive conduct, including engineering profits away from XCar, engaging in self-dealing by directing XCar's profits into constructive dividends and warranty program kickbacks, deliberately attempting to hide XCar's value, and refusing to provide Herdson with the financial information to which he was entitled. Relying on this evidence, the trial court appropriately determined that Fortin and Enslen materially impaired Herdson's rights to his portion of the profits, and therefore engaged in oppressive conduct. The trial court similarly relied on substantial evidence in imposing an appropriate equitable remedy.

As noted, courts are reluctant to grant dissolution as an equitable remedy, preferring to impose lesser fixes. The trial court acknowledged that reluctance, stating specifically that both dissolution and buyout were "extreme remed[ies]" when Herdson first requested them. This, Fortin and Enslen suggest, establishes that the record is insufficient to support buyout. But the court's initial hesitancy to require buyout stemmed from the fact that XCar remained a functioning and potentially profitable business, providing a service to the public. By the time the trial court reconsidered possible remedies, XCar's functionality no longer required consideration.

Fortin and Enslen dissolved XCar in October 2023. Therefore, when potential remedies were again before the trial court on remand, the court no

longer had to consider their implications on the business. In fact, the court explained as such in its additional findings, stating

> [g]iven that XCar is no longer an on-going business and that there is no longer the need to establish procedures or standards to protect the minority shareholder's interest in future net profits, the Court finds there are now remedies available to the Plaintiff as proved in trial for awarding Plaintiff his value of shares of XCar.

In doing away with the business, Fortin and Enslen opened the door to alternative remedies that the court initially considered too extreme. The facts underscoring the need for such a remedy did not change.

Fortin and Enslen next contend that evidence is insufficient because the trial court did not actually require buyout. Rather, Fortin and Enslen claim, the trial court simply awarded damages in contradiction to an earlier finding that Herdson had failed to prove any damages. But this is a misrepresentation of the facts.

The trial court at no point concluded that Herdson failed to prove damages as to his minority shareholder oppression claim. Indeed, the trial court initially appointed the receiver, and eventually the special fiscal agent and forensic auditor, to determine exactly what Fortin and Enslen owed Herdson for his shares. The trial court's statements that Fortin and Enslen reference suggesting that Herdson failed to prove damages, refer to two specific claims: breach of a shareholder agreement and fraudulent inducement. Neither proceeded beyond the initial trial and neither is relevant to Herdson's right to damages on the minority shareholder oppression claim.

11

Because the trial court determined that Herdson was a minority shareholder, that he had experienced minority shareholder oppression, and that no need exists to protect future interests or sustain the business, the trial court relied on substantial evidence and did not abuse its discretion in granting Herdson the value of his shares in XCar.

Share Valuation

Fortin and Enslen next contend that the trial court abused its discretion in awarding judgment based on XCar's June 2021 valuation, more than four years after Fortin and Enslen terminated Herdson's employment. Herdson claims that the court did not err because it appropriately valued Herdson's shares at the time of trial. Because case law does not dictate the time of valuation and the trial court articulated its reliance on credible testimony, the court did not abuse its discretion in awarding Herdson the June 2021 value of his shares.

Property valuation, including share value, is a determination made by the trier of fact. *Eagleview Tech., Inc. v. Pikover*, 192 Wn. App. 299, 309, 365 P.3d 1264 (2015). "An appellate court does not substitute its judgment for that of the trial court in a factual dispute over the valuation of property." *Eagleview*, 192 Wn. App. at 309. However, "an appellate court must be able to determine the method by which the trial court determined valuation." *In re Marriage of Berg*, 47 Wn. App. 754, 757, 737 P.2d 680 (1987).

Fortin and Enslen suggest that the trial court abused its discretion in valuing Herdson's shares as of June 2021 because he lost any management role

in the company in 2017.  But they fail to address both that Herdson retained his shares past the termination of his employment and that no Washington precedent requires that a shareholder maintain control to receive profits.

Given the lack of directive as to how to value shares and the trial court's articulated reliance on a credible witness, the trial court did not abuse its discretion.

First, Fortin and Enslen do not challenge Herdson's role as a minority shareholder.  Similarly, they do not challenge that he retained his shares beyond the end of his employment.  And the trial court unequivocally concluded that Fortin and Enslen subjected Herdson to minority shareholder oppression.  As a result, the record alone does not support valuing Herdson's shares at the end of his employment.

Next, no Washington authority dictates the point at which a trial court should value a party's shares.  Fortin and Enslen point to a variety of out-of-state, non-binding cases, asking that the court align itself with other jurisdictions.  But the trial court has no duty to do so.  Rather, the trial court's only duty was to rely on sufficient evidence in making its determination.

Herdson presented an expert who provided an accounting of the value of Herdson's shares in 2021.  When asked, the expert explicitly testified that she did not value Herdson's shares as of June 2021 to award him the highest amount. The trial court deemed this expert credible, a conclusion that an appellate court will not challenge.  And the trial court articulated its reliance on this expert,

stating "this Court finds that Herdson's expert on valuation to be credible and adopts the valuation of $4.23 Million for Herdson's shares." This provided the reviewing court the information necessary to assess how the trial court determined valuation.

Because the trial court relied on credible evidence in determining valuation and articulated its method of doing so, the trial court did not abuse its discretion.

### Judgment Against Crossborder-Owned Companies

Fortin and Enslen then claim that the trial court erred in entering judgment against the Crossborder-owned companies despite finding them to be distinct corporate entities. Herdson contends that the equitable remedy appropriately included the Crossborder-owned companies because they were both participants in and beneficiaries of the shareholder oppression. Because Fortin and Enslen involved Crossborder-companies directly in the shareholder oppression and share common shareholders with XCar, the trial court did not err in entering judgment against the Crossborder-owned companies.

Minority shareholder oppression includes burdensome, harsh, and wrongful actions, a lack of fair dealing, and a visible departure from the standards of fair play. *Real Carriage Door Co.*, 17 Wn. App. 2d at 458-59. It may further involve damaging a corporation by " 'the siphoning off of profits by excessive salaries or bonus payments and the operation of the business for the sole benefit

of the majority stockholders, to the detriment of the minority stockholders.' " *Real Carriage Door Co.*, 17 Wn. App. 2d at 459 (quoting *Scott,* 148 Wn.2d at 713).

Fortin and Enslen state that the trial court erred in entering judgment against the Crossborder-owned companies because it dismissed all of Herdson's claims against the entities, the Crossborder-owned companies did not own any stock in XCar and therefore could not have oppressed Herdson, and the trial court expressly rejected Herdson's request to pierce the corporate veil because he failed to prove his initial claims of alter ego. In holding the Crossborder-owned companies accountable, therefore, Fortin and Enslen assert that the trial court directly contradicted its earlier judgment. We disagree.

In its findings of fact, the trial court determined that Fortin and Enslen made retroactive changes to financial statements to shift profits from XCar to the Crossborder-owned companies, in addition to withdrawing money from the Crossborder-owned companies through dividends and management fees, engaging in self-dealing and breaching their fiduciary duties to Herdson. These findings track directly with the case law, with Fortin and Enslen siphoning profits from XCar to feed to the Crossborder-owned companies for the sole benefit of the majority shareholders. So, although the trial court did dismiss Herdson's alter ego claims, it nevertheless found that the Crossborder-owned companies were directly involved in the shareholder oppression.

And the fact that Herdson was not a shareholder in the Crossborder-owned companies is immaterial. *Scott* is particularly instructive here. 148 Wn.2d

15

at 718. In *Scott*, Tim Scott challenged the business dealings of two separate corporations, Northwest and TSI, asserting minority shareholder oppression. 148 Wn.2d at 705-06. Although Scott only owned stock in Northwest, the two companies had several common shareholders. *Scott*, 148 Wn.2d at 705-06. Neither company held stock in the other. *Scott*, 148 Wn.2d at 705-06.

Parallel to this case, the trial court in Scott determined that the majority shareholders in Northwest and TSI had engaged in oppressive conduct. *Scott*, 148 Wn.2d at 707. On review, the Washington State Supreme Court noted that, as a remedy for the oppressive conduct,

> TSI could have been required to produce an accounting of the money it loaned to Northwest and the interest it would have charged as compared to the interest paid by Northwest on the line of credit used by TSI. If there were a difference in interest amounts, the respective corporation could then repay the amount.

*Scott*, 148 Wn.2d at 718.

Put another way, if a discrepancy exists between the two corporations, either could be responsible for the remedy, despite Scott only holding stock in one. Therefore, a company under the common control of majority shareholders may be subject to equitable remedies for the misdeeds of another.

Here, it is unchallenged that Fortin and Enslen were majority shareholders in XCar and the sole shareholders of the Crossborder-owned companies. Additionally, this court already determined that substantial evidence supports the finding that Fortin and Enslen engaged in minority shareholder oppression. The Crossborder-owned companies are implicated both through direct involvement and common shareholders. And as a result, the Crossborder-owned companies

16

are subject to the equitable remedy the court imposed on Fortin, Enslen, and XCar. The trial court did not abuse its discretion in entering judgment against the Crossborder-owned companies.

Offsetting Judgment

Fortin and Enslen assert that the trial court erred by failing to offset its monetary judgment for costs it ordered Herdson to pay. Herdson contends that, because Fortin and Enslen failed to object to or request that the final judgment reflect those costs, they waived the issue on appeal. Because Fortin and Enslen failed to raise the issue below, we decline to reach it.

RAP 2.5(a) states that a party must raise an issue at trial to preserve the issue for appeal, with limited exceptions. A party may raise an issue for the first time on appeal if the issue addresses a lack of trial court jurisdiction, a failure to establish facts upon which relief can be granted, or manifest constitutional error. RAP 2.5(a).

Here, Fortin and Enslen did not object to Herdson's motion for entry of judgment or request that the final judgment reflect Herdson's discovery costs. Because it is not the trial court's responsibility to address issues that parties failed to raise, and none of the exceptions apply, Fortin and Enslen waived the issue on appeal.

Special Master

Lastly, Fortin and Enslen contend that, in the event of a remand, this court should vacate the trial court's order appointing a special master. Herdson

17

disagrees, asserting that the appointment of a special master is moot, or alternatively, unripe and invites an advisory opinion.

"As a general rule, [courts] will not decide moot questions or abstract propositions." *Hous. Author. of City of Everett v. Terry*, 114 Wn.2d 558, 570, 789 P.2d 745 (1990). An issue is considered moot on appeal if the appellate court cannot provide effective relief. *In re Dependency of L.C.S.*, 200 Wn.2d 91, 98-99, 514 P.3d 644 (2022). However, this court may provide guidance where an issue may arise again on remand. *State v. LaBounty*, 17 Wn. App. 2d 576, 579, 487 P.3d 221 (2021).

Because no issue exists for which this court could provide effective relief, the issue is moot.

We affirm.

WE CONCUR:

_____

Díaz, J.                          Coburn, J.

18